## McDevitt, Appellant, *v.* Hutchinson.

Argued November 21, 1955. Before STERN, C. J., STEARNE, JONES, BELL, MUSMANNO and ARNOLD, JJ.

*Jerome L. Markovitz,* with him *Markovitz, Stern & Shusterman,* for appellants.

*Joseph F. McVeigh,* with him *Cornelius C. O'Brien,* for appellee.

OPINION BY MR. JUSTICE JONES, January 12, 1956:

These appeals by the respective plaintiffs are from judgments for the defendant in three separate actions for damages for personal injuries said to have been suffered by the plaintiffs through the alleged negligence and willful misconduct of the defendant. The cases were consolidated for trial which terminated in a verdict for the defendant in each case. The plaintiffs severally filed motions for new trial and judgment n.o.v. which the learned court below refused and accordingly entered judgments on the verdicts for the defendant.

The sole error assigned by the appellants is that the jury's verdicts were capricious. No trial error is alleged and, indeed, none could be. The voluminous transcript of testimony which we have carefully examined in the original contains remarkably few objections to the reception or rejection of evidence and, in no instance, did the trial judge rule adversely to the plaintiffs on any substantial evidentiary question. On the

contrary, the trial judge gave the plaintiffs every opportunity to develop their claims fully before the jury. The case was submitted in a charge that was fair, impartial and comprehensive, of which the plaintiffs made no complaint whatever save for their sole exception to the court's refusal of their request for binding instructions which, in the very nature of the evidence adduced, could not possibly have been granted. The material evidence for both the plaintiffs and the defendant resided in oral testimony and called for an exercise of the fact-finder's high prerogative of determining the truth and of rendering verdicts accordingly.

Applying the oft-repeated rule, pertinent to the circumstances, the testimony and reasonable inferences are to be taken in the light most favorable to the verdicts. Such being the procedural situation, the testimony adduced by the plaintiffs must be disregarded except insofar as it may confirm the defendant's version of the alleged occurrence. The thorough and well considered opinion for the court en banc on its refusal of the plaintiffs' after-verdict motions clearly demonstrates that the verdicts were supported by evidence which the jury was fully warranted in accrediting.

The respective judgment in each of the three appeals is affirmed.

———

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

So far as the Majority Opinion in this case is concerned, the subject lawsuit could have been predicated on injuries resulting from an interplanetary crash. The opinion cites no locale, facts, dates, circumstances, contentions or dramatis personae. What happened? If the plaintiffs were hurt, how were they hurt? On what specific circumstances do the appellants seek a reversal

of the Court below? The Majority Opinion does not say.

If readers of the State Reports are not to assume that the Supreme Court has here passed on shadows projected by phantoms, some tangible fact must be recorded and some observation made as to what this case is about. The "voluminous transcript of testimony" to which the Majority refers, contains 450 pages and relates events of significance which should not be wiped out by an opinion which, while consigning these events to oblivion, evokes a mystery as to the situation which called for a Supreme Court intervention which never took place.

Opening the book of the 450 pages, the enigmatic story unfolds. On April 4, 1951, some employees of the J. Sullivan & Sons Manufacturing Company in Philadelphia were picketing the establishment of their employer with whom they were engaged in a labor dispute. At about 11 o'clock a.m. of that day, the president of the corporation, Arthur Hutchinson, drove up to the plant in a truck owned and operated by an independent contractor, Maurice Berkowitz. As the truck approached a short tunnel which led to the plant yard, 12 to 15 women-employees formed a chain across the front of the tunnel in order to impede the truck's movement. The driver Berkowitz refused to proceed further and dismounted from the vehicle. Hutchinson resolved to take the truck into the plant himself.

The tunnel measured 44 feet in length, 11 feet and 2 inches in width, and 12 feet 5 inches in height. At its widest point the truck measured 96 inches. Because of the angularity of approach to the tunnel the truck allowed a clearance of only 10 inches on each side at the entrance. Once straightened out, the space remaining on either side would not exceed 19 inches.

When Hutchinson announced his intention to take the truck through the blocked entrance regardless of the presence of the women pickets, the latter fell back into the tunnel, and three of them, the plaintiffs here, were injured. They claim that they were struck, bruised and crushed between the walls of the tunnel and the sides of the truck. The defendant Hutchinson denied that at any time the truck came into contact with the plaintiffs. The jury returned a verdict for the defendant. The plaintiffs appealed, arguing for a new trial.

When a factual controversy is resolved by a definitive verdict, the verdict should terminate the litigation unless it so offends against reason or so defies mathematical and scientific computation that a substantial doubt arises as to whether justice has been done. In the case of *Londrino v. The Equitable Life Assurance Society*, 377 Pa. 543, decided in 1954, this Court, speaking through Mr. Justice JONES, said: " 'While this Court usually supports the action of the trial court in granting or refusing a new trial we do not entirely abdicate our reviewing functions in such cases. This Court, too, has the duty to determine from the record whether or not the jury's verdict was so contrary to the evidence as to shock one's sense of justice and to make the award of a new trial imperative so that right may be given another opportunity to prevail.' "

While, of course, as in every controverted episode, the smoke of dispute here also rises from conflicting interests as to what detailedly happened, it seems quite evident to me that the actions of the defendant were of such character as to justify another trial so that, as was said in the Londrino case, "right may be given another opportunity to prevail." This lawsuit has nothing to do with the economic differences which existed between the employees and the management of the J. Sullivan & Son Manufacturing Company. The

learned Judge in the Court below well put it when he said: "None of the parties to the litigation can find solace or right for what was done in the fact that there was a labor dispute in existence at the time. . . Neither the rights of management nor labor are involved. Labor law is not applicable. These are not labor cases."

We have here the simple, brutal situation of a headstrong individual determined to overcome the economic difficulties which beset him by aiming a truck against a group of women who, no matter how unwise and imprudent, were not legal targets for his unrestrained wrath. There is no doubt in my mind that the women strayed beyond their own prerogatives when they sought, with their bodies, to barricade the entrance to the defendant's plant. This, however, did not authorize the defendant to break down that barricade with the battering ram of a truck. Hutchinson was not without legal remedy: the police department, the Courts, the Labor Relations Board were his to appeal to for guidance, assistance and support. He was not warranted, no matter how provoked, in taking the law into his own hands.

The defendant's eyes could not but inform him that by insisting on passage through the tunnel with women in it, collision and injury were inevitable. Many factors bespoke calamity: the tunnel was unlighted, the defendant was an inexperienced driver, he had never operated the truck before. He knew that the owner had refused to drive the truck, not out of sympathy with the strikers (he was a non-union man) but because his senses proclaimed to him the danger which lay ahead. Even if the truck followed an accurate course down through the center of the tunnel, the maximum space on either side would not exceed 19 inches. Since the average adult person measures more than 19 inches in width, it was obvious that in the resulting tight squeeze

of the human being—between the truck and the tunnel wall—flesh and bone would have to give way before iron and steel. And then, if the truck did not hew meticulously to the center line, there would be less than 19 inches on one side, with increasing jeopardy to the person pinned in on that narrow side.

The defendant himself testified: "Q. Were you driving that truck down the center of the tunnel? A. I don't believe I was. I think that would be a physical impossibility for anybody— Q. I thought it would. A. —to drive a truck or a pleasure car on due center in 136 inches. Q. Is there a line drawn there, a white line or a colored line? A. No. You have a 9 inch wall guard at the gate and that keeps you from hitting the wall with your truck body. It is impossible to get the truck body any nearer the wall than that nine inches."

On the physical facts alone the defendant was performing an operation so fraught with hazard that it easily came within the definition of wanton misconduct. The plaintiffs, of course, were quite probably guilty of contributory negligence, but this, in view of the defendant's wanton misconduct, would not bar them from recovery. In *Kasanovich v. George,* 348 Pa. 199, 203, this Court said "Apparently all of the jurisdictions in which the question has arisen have held that contributory negligence is not a defense to an action for injury caused by reckless or wanton misconduct on the part of the defendant. . . Negligence consists of inattention or inadvertence, whereas wantonness exists where the danger to the plaintiff, though realized, is so recklessly disregarded that, even though there be no actual intent, there is at least a willingness to inflict injury, a conscious indifference to the perpetration of the wrong."

Whether the defendant's actions amounted to wanton misconduct may be gleaned from the following testimony:

Anna Yakolbczyk, plaintiff: "Q. When the truck struck you where were you standing? A. I was standing left side. Q. On the left side of the truck? A. On the left side of the truck, yes. Q. Were you able to get out of the way? A. I cannot, I have no way to get out. The truck, you know, lunged forward and then ran back again. The only thing, I have no chance to get out."

Edna S. McDevitt, plaintiff: "So he drove up on the pavement, part way up on the pavement, and he stopped and the driver would not go through and Mr. Hutchinson told him to go through. Well, he would not do it. So he made another attempt to go through and he just stopped the truck right here and he would not go through. So Mr. Hutchinson says to him, 'Well, if you don't go through,' he says, 'I will,' and he got out of the side of the cab on the right side—I was on the right side—and I heard him say, 'If you don't go through I will run through and kill the bastards,' and he walked behind the truck and got on the driver's side and he pushed the driver over and he took the wheel. What he did to the gearshift I don't know, but the truck lunged forward and when it lunged forward it hit me in the knee and then it rolled back. That is how I got back then. I could not get out the driveway. I had to climb over cement blocks to get out."

Iva Alice Eyerman, plaintiff: "I was in front of the truck in the beginning and when the driver refused to go through Mr. Hutchinson says he was going through if he had to run over us and kill us."

Betty Kritzberger, disinterested witness, testified: "I was around the back taking the license number. Then I looked up, as I say, and I saw this girl at the mirror. I would say the truck was two or three feet into the alley—into the driveway, rather—and I jumped up and grabbed the girl, Mary Koenig, by the dress and I

pulled on her dress, tried to get her out, and I heard the girls asking the driver not to go through the picket line and I heard Mr. Hutchinson say, 'Go ahead, go through if you have to run them down.' With that the truck driver put his hands on his lap and Mr. Hutchinson got out of the cab of the truck and went around. He says, 'I will take it through,' and he went around and climbed in the cab by the driver's side of the cab, and as he got in he said to driver, 'How do you drive this thing.' And the truck leaped forward and Anna screamed and it rolled back. That is when we got the girls out, after the truck rolled back. It rolled back far enough to let the girls get out."

The defendant, by his own admissions, brought himself within the definition of wanton misconduct: "Q. And what did you say to him? [the Union business agent] A. I says, 'Fred, you know I have a legal right to come in and I am coming in,' or 'coming through' —'in' or 'through.' I am not sure of the exact words; one or the other. Q. And when you took the wheel of that truck you intended to go through that tunnel, did you not? A. That was my object, to move forward with the truck to go into the tunnel and deliver the tape, yes, sir. Q. You intended to deliver the tape no matter who stood in front of you, did you not? A. Regardless of who stood in front of me? Q. Yes. A. If you mean if they laid down under the wheels I intended to run over them, Mr. Markowitz, the answer is no. . . Q. And for how many feet were they in front of you as the truck moved in? A. Ten or twelve feet, I would say. Q. They were still in front of you? A. That is right. Q. And at no time did you stop? A. No, sir. Q. And at no time did you blow your horn? A. No, sir. Q. And at no time did you shout a warning? A. No, sir."

If, in fact, the defendant blindly drove the truck into the tunnel regardless of consequence, his action

would be no less culpable than if he had fired a gun into the darkness of the passageway, knowing that human beings stood before the trajectory of the projectile.

The question before us, of course, is not whether the defendant is liable to the plaintiff in damages because this is strictly a question of fact for the jury. We are merely to pass upon the action of the lower Court in refusing a new trial. In *Mix v. North American Co.*, 209 Pa. 636, this Court said: ". . . when there is an allegation of the court's abuse of its discretionary power in passing upon an application for a new trial, we have repeatedly held it to be our duty to inquire into the facts, and if, after due consideration of them, abused discretion clearly appears, the improper action below must be reversed and the wrong done corrected . . ."

In discharging that duty, a reviewing court should not hold itself within the restricting tunnel of technicality, but it should look beyond the confining spaces of formality to see whether the complaining litigant has been afforded every opportunity to prove the justice of his grievance.

While, of course, criminal liability does not establish civil liability, it is relevant to note here, in considering the grounds for a new trial, that the defendant was on the same facts found guilty in Criminal Court. The records of the Court of Quarter Sessions of Philadelphia County (327 October Session, 1951) show that the defendant was indicted for aggravated assault and battery, that he pleaded not guilty, but was found guilty and sentenced.

I believe, after considering the entire case and all the circumstances connected with it, that the three injured women plaintiffs are entitled to a new trial.